Good morning, Your Honors, and may it please the Court. I'm Talisee Brooks for Plaintiff Appellants, and with me at Council Table is Lori Ruhle. I'd like to reserve three minutes for rebuttal, and I'll keep an eye on the clock. Your Honors, as this Court reaffirmed in Wild Earth Guardians, plaintiffs alleging a procedural injury must show only that they have a procedural right that, if exercised, could protect their concrete interests. Plaintiffs here, five conservation groups with members throughout the West, including many members in Idaho, satisfied that standard by showing through their eight standing declarations that Wildlife Services' flawed NEPA analysis and decision to continue and expand its wolf-killing activities in Idaho harmed their concrete interests in wolf presence, and that a new NEPA analysis and decision could redress their procedural injuries. And here's why. First of all, through a new NEPA analysis, Wildlife Services could choose a different approach. In the EA that is at issue in this action, Wildlife Services evaluated several different alternatives, including a non-lethal-only alternative, a non-lethal-before-lethal alternative, a technical-assistance-only alternative, and a no-Wildlife-Services-in-Idaho alternative, and that's in the supplemental excerpts at 137. Instead of choosing any of these actions, which would have been less harmful to plaintiffs' interests, it chose the existing program plus expanded control for ungulate protection. The question is whether it would have been ultimately less harmful. I mean, what the District Court's notion was based on was some assumption or projection of what would have happened if, for example, they chose the no-wildlife involvement option. He says, well, the same thing would have happened anyway, essentially. And you're saying, well, maybe, but maybe not. That's essentially your argument. That's exactly right, and so, and that's actually There's also the difference, I think, between a NEPA procedural injury and a substantive outcome, because NEPA's not even about the substantive outcome per se. It's about a process. So one could, in theory at least, have standing to raise a NEPA claim, even if unsuccessful ultimately on the desired outcome. That's correct, Your Honor, and that is exactly what this Court held in Wild Earth Guardians. That's precisely the principle that this Court's decision relied on. As far as the question, could you repeat, Judge Burzahn, what your comment was just there? My comment was basically that you just assumed the injury, and that the District Court's whole problem was that he I understand it was based on redressability, but it was redressability meaning the way things play out, you may not have an injury, and you're saying that is not He seemed to think you wouldn't have an injury, because Idaho was in control of the wolf methodology, and it would have the same, one way or another, would somehow end up with the same wolf kills as there are now. I gather the only thing in the record that addresses this is this very short declaration. Yes, Your Honor, or that's the main thing that Wildlife Services is relying on, and I think that the real essence of the District Court's error in this case, it's in the ER at 20 and 24, but he treated it as though, the District Judge treated it as though, we had to show that certainly the result of this procedure would be more wolves on the ground, when in fact all we had to show was the possibility, the could standard. And so there's numerous facts in the record that support the notion that indeed, if Wildlife Services selected a different alternative through a new analysis, that could standard would be satisfied. On the redressability issue though, this case is a little different than Wildlife, or Wild Earth Guardians, where Nevada's program, I think, was entirely speculative at that point in time, and here we have at least a partially established Idaho program for wolf management. In fact, you could argue that it was fairly comprehensive, even though the federal authorities were heavily involved in the killing aspect. Well, Your Honor, actually if you compare the Compton Declaration, which is at ER 50 to 51, with the declaration that the state submitted in the Nevada case, the types of statements that they make about what the state would do are very, very similar, and they're relying in both cases on these sort of broad, vague statements. I think that the, and also the other thing that I would direct the Court's attention to is the wolf plan under which Idaho manages wolves, which really is very broad and allows Wildlife Services quite a lot of discretion and indeed mentions Wildlife Services' role specifically, and that's also in the supplemental excerpts of record. I don't think I have the site here handy, but it's the same thing. It's a very broad authorization, and I think that really the only real distinction between the program in Idaho or Idaho Fish and Games program in Idaho and what was the case in Nevada is I think that the Nevada program was almost entirely federally funded, whereas Idaho has established a specific fund to act as a conduit to give money to Wildlife Services to kill wolves. And is it your argument that the Wildlife Services' specialized expertise is necessary to really make the program work in Idaho? Yes, Your Honor, that is our position, and that's based on both the fact that specifically because of that expertise in the ER at 241 and also because in the answer, which I believe is ER 147, Wildlife Services admits that it has this special expertise. And so even if Idaho did have its own program, when you look at the facts here, it really shows that they're still relying on Wildlife Services. They've asked for assistance from Wildlife Services every single year since wolves were delisted, including the one year in which the Idaho Fish and Game independently killed 14 wolves. There is no program that's entirely redundant to Wildlife Services, which was the standard that this Court employed in the Wild Earth Guardians' decision. The defense is asking this Court to rely on Export-Import Bank, but that case and the other cases that the defendant is relying on are distinguishable. And that's because in almost all of those cases, the defendant agency only funded or perhaps had some regulatory authority over the injury-causing conduct. But the conduct that was the source of the injury and gave rise to plaintiff's concrete interest was actually carried out by third parties. And so in that sort of situation, there really is a question about whether pulling funding or whether overturning the regulation will have an effect on the third parties that are causing the injury so that the plaintiff can have some redress. But in this case, it's Wildlife Services and not a third party. That's the direct cause of plaintiff's injuries. Wildlife Services prepared the EA and decision at issue here. It chose the scope of the EA and the range of alternatives analyzed, including whether it should continue its involvement in wolf damage management in Idaho at all. And that's in the excerpts of record at 207. And Wildlife Services carries out the decision, and that includes deciding which activities to undertake at the site-specific level through applying its wildlife decision model, which is in the ER at 220. And it also typically, according to Wildlife Services, includes consideration of both lethal and nonlethal methods. And that's in the ER at 228. So what the defendant is essentially asking this court to do is to speculate that the possibility that Idaho Fish and Game would fully replace all of Wildlife Services' activities defeats redressability, but that's not really supported by the record. As I mentioned, the Compton Declaration, and that is, again, just stating in broad terms that IDFG has some capabilities to replace Wildlife Services' actions through independent contractors or other means, but it doesn't say specifically that they would. Also, Idaho Fish and Game has only killed 14 wolves, or only within the span from 2011 to 2014, it only killed 14 wolves, whereas Wildlife Services killed at least 247. And Idaho Fish and Game has relied on Wildlife Services every year. And what I think is actually a really important distinction here between the facts and what the district court relied on is that Idaho Fish and Game requests assistance from Wildlife Services only when sport hunting of wolves fails to achieve the desired population reductions. So it's not that Idaho Fish and Game can't simply increase bag limits or wolf quotas and deal with a discrepancy that way. If they want to deal with these depredation issues, they've relied on Wildlife Services. And the excerpts of record support that at 204, 287 through 91, and 298 through 99. Since this is a procedural injury case, is it the case that the EIS, in your view, should analyze whether Idaho can take over the entire program or not? Is that the issue? Well, I don't think that that's really what an EA or EIS should do. And actually, the EA at issue here did assume that Idaho would take over certain aspects of the program at various points. But I think that the real – I mean, this is about a federal agency action that Wildlife Services undertakes. So they need to analyze what their engagement is going to be. So if – See, this is kind of a follow-on to Judge Thunheim's question. Is the argument that the EA was inadequate or that – in itself? Or should there be a full EIS? What is your position on that? We made both of those arguments on the merits. So – and we also had a supplemental NEPA claim. Basically, you know, this EA was produced in 2011 before wolves were delisted. And right after wolves were delisted, circumstances really changed for the wolf population in Idaho drastically. So we still believe that an EIS is necessary. So to – this case really is on all fours with this court's decision in Wild Earth Guardians in light of the relaxed redressability standards for procedural injuries. And we would just ask that this court affirm – or – excuse me. Don't affirm. Reverse and remand the district's court's decision. Send this back down so that we can have our day in court. And with that, I'll reserve the rest of my time. You may do that. Good morning. I'm Kevin McCardle of the Department of Justice on behalf of Wildlife Services and may it please the court. The relaxed redressability standard that applies in procedural injury cases gets the plaintiffs this far. They don't need to prove that if Wildlife Services did a new NEPA analysis, it would decide to curtail its lethal wolf removal services. They only need to show that Wildlife Services could make the decision. Nevertheless, as the court emphasized in the Export-Import Bank case, that decision – the plaintiffs still have to show that that decision that they want would redress their injuries. Because if it wouldn't, if they'd still suffer the same recreational and aesthetic harm. But how do we even know that without having the appropriate analysis? If the agency has done an inadequate analysis and the plaintiff says, you know, we've been involved in the process and we think the process is inadequate, the analysis is inadequate, how can you possibly say it would come out the same way if there were a full and proper analysis? Well, Your Honor, I'm not suggesting that the agency's decision would come out the same way. We can assume for purposes of this discussion that Wildlife Services decides no more lethal wolf removals in Idaho. There's a remaining question. Would that decision redress the plaintiff's injuries? And how do we answer that question? Because Idaho may fill in the gap and may not. There's certainly nothing in this short declaration which says that we're going to do that. It sort of says, well, we may have some capability. But as she pointed out, in fact, most of the wolf killing has been done by Wildlife Services. So what do they have to allege about the speculation about what Idaho would do? Well, we're beyond allegations now because this case was decided at summary judgment. Okay, fine. But Mr. Compton, who's basically all there is, as I understand it, says that Idaho's responsible for managing the wolves and sometimes they contact with USDA, which is a little of an understatement because apparently 90 percent of the killing is done by Wildlife Services. And they have the capabilities to perform wildlife control activities. It's conducted some activities. It has some agreements. That's it. He doesn't say we would do it, we could do it, we could get along without them, anything like that. I need to take a step back in response to your question, which I'm going to answer. But let's focus on what's at stake here. What's at stake is not the majority of wolf killings in Idaho. The majority of wolf killings come from sport harvest, which is Idaho's primary tool for meeting its state management objectives. What we're talking about here are supplemental wolf removals to address livestock depredation and protection of ungulates. And that accounts for approximately 17 percent of annual wolf mortalities in Idaho. And that's evident from FER 14, SCR 141 through 142. But very little of that killing is done by the state, correct? Correct. I just wanted to make sure we were clear about we're not talking about anywhere near the majority of killings in Idaho. Okay. Why does that matter? Just to make sure that the record's clear that we're only talking about supplemental removals. Now, we have Idaho's – Idaho has the authority to do it. They don't need any permission from the United States to do supplemental wolf removals. They have the intent to do it. They've stated repeatedly on the record that if Wildlife Services withdrew, they would do – they would do wolf removals to protect livestock and ungulates. Where is this in the record other than in this Compton Declaration? Well, that's not in the Compton Declaration. Okay. It's Idaho's statement at ER 241, SCR 42, and SCR 49. Next, they have the money to do it. Just a minute. What form of statement are we talking about? What – this is in the management report, or what is it in? No, it's in – it's in the EA, and it's in an application that Idaho submitted to the U.S. Fish and Wildlife Services when Fish and Wildlife Service was still managing the species when it was listed. They said, we want authority to engage and take to protect livestock and ungulates. But that's the authority question again. That's different. But they also said at those places that if Wildlife Services doesn't do it, we're going to do it. So they have the clear intent. Then they have the money. The State of Idaho established the Wolf Depredation Control Board in 2014 as a matter of state law. That board allocates funding for wolf removal to protect livestock and ungulates. They don't need any money from the United States. Now we get to the Compton Declaration. I'm just confused by one thing before you get there. One of the arguments that opposing counsel has made is that things have changed since 2011 when this EA was issued, and you just said, well, look at what happened in 2014. Doesn't that suggest that they're correct, that new information should be taken into account? Because you're relying on it too. Well, standings evaluate as of the date the complaint was filed, not as of the date the EA was prepared. And that's a critical fact. Well, it is. It just seems to be kind of odd that you're doing the same thing as the other litigant in a way of saying, you know, let's look at all the changes that have occurred. Well, yes, but we're entitled to do that with respect to standing because that's evaluated five years after the EA was issued because the plaintiffs didn't bring suit until June of 2016. That's the relevant date for standing. And the plaintiffs should be the ones presenting evidence showing that as of that date, the remedy they seek would redress their injuries. It's not our burden to disprove that hypothesis, and yet we're the ones who came forward with a declaration and other evidence to show that as of the date the complaint was filed, Idaho was managing the species. Idaho had authority to take wolves to protect ungulates and livestock. They had the money to do it. They had the intent. And in the Compton Declaration, he does indicate in a sworn declaration that agreements are in place with other entities. All right. Could you tell me again where this intent is? There's a letter at ER 241. Is that part of it? Dear Jeff, sincerely nobody with no date on it? Yes, I believe that's one of them. All right. Well, that's not. That says only, as I read it, that with regard to a particular subcategory, i.e., with regard to the ungulates, because that isn't what the Wildlife Service was doing before. They said that we want to do this, and if you don't do that, then we plan to do it. But that's not general. It's only with regard to a particular subproject. What else is there? Okay. There's SCR 42, which is an EA. That one is actually ungulates as well. Okay. That's separate. Then what else? Then we have SCR 49. Which is, I mean, I'm dealing with ERs and you're dealing with SCRs, which is making it difficult. But go ahead. Okay. Well, SCR 49 is another. And what is it, that page? What is it, SCR 49? It's another statement that wolf removal will be accomplished by the Idaho Department of Fish and Game and other approved agents of the state. Wolves that inhabit the low-low zone will be targeted for removal. That one also applies to ungulates. Right. Okay. That's all because, as I understand it, originally the Wildlife Services wasn't dealing with predators of domestic animals and not with ungulates. Right? That was the original plan. And the EA did cover adding the ungulates. Correct. All right. But none of this goes back to the original role of Wildlife Services. Well, the Compton Declaration and ER 241 as well. They say that they would step in and take over to take up the slack. And I think the other point is, Your Honor, standing is not an affirmative defense. It's not the government's burden to disprove redressability. It's the plaintiff's burden at summary judgment to come forward with specific evidence showing that their injuries would be redressed. How can you possibly demonstrate what somebody is going to do if something else happened that hasn't happened? Well, they could, whether they can prove it or not. Isn't this case the obverse of the whole line of cases derived from Simon v. His Conducting Welfare Rights through the Export-Import Bank case and many others, where the problem was that the federal government was not the direct actor. The federal government was doing something that might induce someone else to do something. But here we have the opposite. The federal government is the direct actor. And you're saying if the federal government doesn't do it, somebody else might do it. That's the opposite. Yes. We're in a different location, Your Honor, in the causal chain. But that's not the critical determinative factor for redressability. But it's an unknowable one as a result. It's a question of which way you cut the speculation. I mean, in the other one, the plaintiff needs to demonstrate that if the government does X, that somebody else is going to do Y. But here you want the plaintiffs to demonstrate that if the government stops doing the direct thing, then someone else is going to do it instead. I mean, it seems to me that if you took that seriously, you would undermine NEPA enormously. I mean, if the government doesn't build a dam, somebody else might build a dam. How do you prove that isn't true? Well, I mean, that's the only way their injuries are redressable. That's an essential element of Article III standing. Well, in a sense, yes. But I keep coming back to the idea that this is really a procedural injury. And NEPA never guarantees a result. That's not the point. It guarantees a hard look. And so if the requisite hard look has not been taken, then that is a procedural injury, and it would be redressed by doing the correct analysis, whatever the outcome. And I just have trouble seeing how your construct fits into that, because it basically says, well, we don't have to really do the analysis, because downstream we can show that really, you know, they won't be happy no matter what. I just don't understand how that works with our NEPA cases. Your Honor, the absence of a new NEPA analysis is not the procedural injury. The court addressed this in the Navajo Nation case. The procedural injury is the threat to a concrete and cognizable interest as a result of the government's alleged violation of the procedural requirement. Well, they did demonstrate that. All the stuff about, you know, interest in wolves and all that, that's not an issue here. That so ‑‑ but when the ‑‑ but the injury is a procedural injury. But as the court explained in Navajo Nation, that's sort of a ‑‑ that concept encompasses the harm to the Petitioner's, the Plaintiff's, concrete interest. And their concrete interest is in preservation of the wolf population. And if the exact same number of wolves would be killed anyway ‑‑ Which we don't know. Well, the evidence that we presented indicates that the same level of wolf killing will occur. So basically this comes down to, even if we accept your construct, our reading of the record, whether the record establishes that. Yes. In the typical NEPA case, the defendant agency, the paradigmatic case in Lujan, where the agency licenses the harmful project, the agency is a legal prerequisite for the injury causing conduct. It's a legal necessity. Now, this case isn't like that. That's what makes this case and the funding cases unique. Idaho doesn't need any legal permission from us. But the funding cases deal with the fact that the government is not doing anything directly to injure, you know, to kill the wolves, right? Right. But the court in Exxon, excuse me. Export. Export, import, bank, hit the nail on the head when it said the issue isn't ‑‑ it didn't say these words. The issue isn't where in the causal chain the government lies, whether it's the first or the middle or the last link. It's whether it's a necessary link. Is it a necessary party? Would the same causation ensue if the government's link was removed? That's the critical question for redressability. Is the agency a but‑for cause? Is its participation necessary? So you're absolutely right, Your Honor. In this case where the agency's participation is not legally necessary, then it comes down to a factual issue. But just to take another hypothetical. The government wants to build a building in a certain place, right? And they say you didn't do a NEPA standard. And the government says, well, it doesn't matter because if I don't build this building, somebody else is going to build the building. Is that a legitimate answer? I mean, even if it's true, I mean, even if they can demonstrate that in fact, because NEPA only runs for the federal government, right? And it only deals with federal government projects. So if the federal government has a project, we are worried about the environmental fallouts. And if somebody else builds the project, NEPA has nothing to do with it. But the fact that someone else is going to build a building in the same place, it isn't an answer, is it? Your Honor, in your hypothetical, I think you're assuming that the government is licensing the project. No, I'm assuming that the government is actually going to ‑‑ says I'm going to build a building on 4th and Main Street, all right? And they say, oh, no, you have to have a NEPA statement. And they say, well, actually, if we don't build this building on 4th and Main Street, they're just going to sell it to somebody else who's going to build a building on 4th and Main Street. Is that an answer? Who's authorizing the construction of the building? Well, the government's out. What difference does that make? It makes a huge difference. Well, because what you're saying is if the federal government doesn't do it, someone else will. So who cares what the federal government's analysis is? And that's the point of Judge Berzon's question. If I can demonstrate for sure that the government, if it doesn't build this building, that some private developer who isn't subject to federal NEPA standards is going to do it, does that excuse having an adequate NEPA analysis? Well, we're focusing on redressability. If the government's taken out of the equation, would the building still get built? Yes. If the answer is yes, then the plaintiff's injuries from the presence of the building aren't redressed. So, therefore, nobody can ever challenge the NEPA analysis of the government, and it can just get away with whatever it wants without following the required statutory analysis, right? Nobody without standing can challenge the NEPA analysis. Well, who would have standing then? Under your theory, no one would have standing. And the solution would be to sue the entity that's authorizing the harmful conduct, not simply one link. But the whole point is that NEPA only runs the federal government projects, but it does run to federal government projects. Well, if the federal government is going to build the building, then the federal government is responsible for doing the analysis. If somebody else is authorizing it or building it, they are not responsible for doing a NEPA analysis. So that gets the government off the hook? Well, for purposes of Article III, if the plaintiff's injury is not going to be redressed, then they don't have standing, and it doesn't matter that they've brought a NEPA claim. And the NEPA claim relieves them of the burden of having to prove that the government would reach an agreement. Yes, and your answer relieves the government of the obligation that it has by statute to do this analysis properly, because no one can ever challenge it. No one without standing can challenge an action of the government. Do you have any example of the variety that I'm suggesting, in which the plaintiff was required to prove that if the government didn't do the project, the project wouldn't get done by anybody? Your Honor, as far as I'm aware, the Wildlife Services role here as merely a service provider is unique, as far as I'm aware. I'm not aware of any other instance in which the government doesn't authorize the injury-causing conduct. That's why this issue comes up so infrequently, because in a typical NEPA case, the Lujan example with the licensing of the dam, you take away the government license, the dam doesn't get built, because the government is the authorizing entity. Yes, but I'm talking about kinds of cases where the government is not just the licensor. They are building a project. Pursuant to someone else's license? I'm not familiar with cases like that. I don't know someone else's license. I mean, you know, where there's a national park, and they're going to build some administrative buildings in the park. But who is authorizing and directing the project is the critical inquiry, because that's the energy that's ultimately responsible for the injury-causing conduct. Has Idaho promised to take over aerial killings of wolves? Idaho has indicated in the Compton Declaration and in some of those record excerpts that we discussed earlier that if Wildlife Services doesn't do it, they will do it. They've killed 14 before in one year, 2013. Did not do aerial killings. And if I don't read the records establishing that, then you lose. Well. Is that right? Well, they have the burden of proof. You'd have to show that we haven't even created a genuine issue of material fact on that. This is a summary judgment. We're the ones who presented a declaration. We show that Idaho has the funding, the intent, the stated capacity. All the facts show that as of 2016, Idaho has the capacity, the intent, the authority to do the supplemental. But all aerial killings in the past have been done by Wildlife Services, correct? Correct. They have the specialized training for that. Idaho did 13. They killed 13 by aerial killing in the Lolo Zone in 2013, which is the same annual average that Wildlife Services has done each year in those areas. So they have done it in the past. But that all has to do with the ungulates again. That has to do with the ungulates. But there are other sites in the EA that we cited in our brief that show that, and this is an important point because this gets right to your Honor's point, which I didn't address before, that Wildlife Services even says, if we stepped away, it's reasonably likely to assume that the same level of killing would occur, given Idaho's stated intent. And that covers both. It says that in the EA? In the EA, cited in our brief. And I know I have it in somewhere, but I don't have the time. Thank you, Counsel. You've exceeded your time, and we asked a lot of questions. Ms. Brooks, you have some rebuttal time remaining. Thank you, Your Honors. I just want to begin really quickly by answering your question, Judge Tunheim. I'm not sure that the record establishes that Idaho Fish and Game killed those wolves by aerial killing, and we just have to review the record sites. But Wildlife Services does state that it has special expertise in killing wolves by those means, and that fewer wolves would likely be killed if other entities tried to take over that action. And to relate that to the concrete injury would affect wolf behavior and distribution because of the specialized nature of the aerial killings and the locations that you can go to. It could, yes. So I think that the real key here is that if Wildlife Services is available, the government or Idaho uses them. And the opposing counsel asked would a decision in our favor in a new EA redress our injuries, and the answer is yes. Because if Wildlife Services chose, for example, a nonlethal alternative, there's a lot of science that says, new science, that that nonlethal control could work. If the nonlethal methods worked, and we discussed this in the record in the ER at 269 to 81, if the nonlethal worked, then the number of wolves that need to be killed could be reduced. And there's no reason why if a nonlethal technique is resolving a depredation problem, Idaho Fish and Game would nonetheless go ahead and kill wolves. So there really is a real prospect for redressability here. We've met the standard, and we would just ask that this court give us our day in court. Thank you, counsel. The case just argued is submitted. We appreciate the helpful arguments from both counsel in this interesting case. And we will stand adjourned for this morning with the reminder that we'll be back after our conference to talk with the interns, students, anybody else who wants to stay or come back. Thank you.
judges: Graber, Berzon, Tunheim